## Case No. 3,293.

### COWDREY v. RAILROAD CO. et al.

#### [1 Woods, 331.][1]

Circuit Court, E. D. Texas. May Term, 1870.

RECEIVER OF RAILROAD — ACCOUNTING—MASTER'S REPORT — EXCEPTIONS — COMPENSATION — DISCHARGE FOR MISCONDUCT.

1. When the accounts of a receiver are referred to a master for report, no exceptions thereto will be considered by the court unless first made before the master.

[Cited in Whitney v. City of New Orleans, 54 Fed. 617, 4 C. C. A. 521.]

2. This rule would not, however, deter the court from directing an account to be reformed

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

which contained manifest errors, or clearly improper charges.

[Cited in Cutting v. Florida Ry. & Nav. Co., 48 Fed. 508.]

3. A receiver is an officer of the court as well as the master, and states his own accounts and submits them to the master for inspection, under the order of the court, the master acting in place of the court in a judicial rather than ministerial capacity.

4. Exceptions to the master's report do not lie in such cases. Nevertheless, if the master adopt any erroneous principle, in allowing a receiver's account, the court, on petition, will refer the matter back to him for correction.

5. When a report upon a receiver's account is submitted by a master, the duty of the court consists in reviewing the principles and rules adopted by the master in allowing the accounts, rather than in examining the items in detail, or the evidence on which they are founded.

[Cited in Strang v. Montgomery & E. R. Co., Case No. 13,523.]

6. All outlays of the receiver of a railroad intrusted with its management and operation, made in good faith, in the ordinary course, with a view to advance and promote the business of the road and make it profitable and successful, are fairly within the line of the discretion necessarily allowed him.

7. In extraordinary cases, involving a large outlay of money, the receiver should always apply to the court in advance for authority to make the purchase or improvement proposed.

8. Except in extraordinary cases, the submission by the receiver, at frequent intervals, of his accounts to the master, giving the latter an opportunity to disallow whatever he may not approve, will be regarded as a sufficient reference to the court for its ratification of the receiver's proceedings.

9. The receiver's expenses for counsel and witness fees, incurred in resisting a motion for his removal, allowed as a charge against the trust fund when it appeared that he had acted in good faith and with integrity of purpose, and when it further appeared that there were apparent grounds for the motion.

10. The question of allowance to the receiver for his services is one that properly belongs to the master's office, and not to the court.

11. When there is nothing in the administration of the trust to convict the receiver of want of integrity or good faith, want of foresight in regard to the future developments of business is no reason for denying him compensation or reducing its amount, especially when the trust has been administered with reasonable success.

12. What another, even competent, person would have done the work for, is not the proper rule in fixing the compensation of a receiver. It is to be graduated somewhat by the duties, and somewhat by the responsibilities of the office.

[Approved in Central Trust Co. v. Wabash, St. L. & P. Ry. Co., 32 Fed. 188.]

13. Defendants, in a suit in equity to foreclose a mortgage on a railroad, agreed with complainants that on giving security in the sum of $350,000, they should have possession of the road and name the receiver, and the bond was given according to this agreement, and one of complainants appointed receiver: Held, that defendants could not object to such receiver unless he committed some act of unfaithfulness to his trust, and the court refused a motion to discharge the receiver, the evidence failing to show any want of faithfulness on his part since his appointment.

14. While the principal cause was pending in the supreme court of the United States, the circuit court refused to authorize the receiver to

make any radical change in the condition of the railroad property by purchasing the bridge across Galveston bay, or by building or contracting to use a new junction road through the city of Houston.

[There was a decree of foreclosure in] the principal case in this suit. [Each of the parties appealed therefrom to the supreme court. The determination of the appeal] is reported in Galveston R. Co. v. Cowdrey, 11 Wall. [78 U. S.] 459.[2]

The following opinion was delivered at Galveston, in May term, 1870, upon points arising in the management of the property, by a receiver, pending the appeal of the principal cause in the supreme court:

The bill was filed, February 12, 1867, to foreclose three several mortgages, given on the railroad and its franchises. Tipton Walker, Esq., was appointed receiver, and acted as such until October 1, 1869, when, by consent of parties, N. A. Cowdrey, one of the complainants, was appointed, giving security to the amount of $350,000. The first receiver having rendered his accounts, the same were referred to different masters for examination, who reported thereon. Both parties excepted to these reports. The defendants also moved for the dismissal of Cowdrey as receiver. The latter moved for authority to make certain expenditures in the management of the road.

All these matters came up for hearing before Mr. Circuit Justice BRADLEY, when, after much argument and discussion, the following opinion was delivered and the following orders made:

Jer. S. Black and Wm. P. Ballinger, for defendants.

W. G. Hale, for Cowdrey, receiver.

BRADLEY, Circuit Justice. 1. The first exceptions presented, are to the report of Master Hughes, made upon the accounts of Tipton Walker, receiver, for the months of February, March and April, 1867.

The first exception is, that the defendants had no notice of the time and place of proceeding before the master in respect to said accounts. This appears not to be founded in fact. Due notice is shown to have been given to the solicitors of the defendants. None of the exceptions were made or taken before the master. No objection to these accounts appears to have been made before him. It is well settled that unless exceptions are taken before the master, they cannot afterwards be taken before the court. This is required in justice both to the master and to the receiver. To the master, that he may have an opportunity to reconsider his decision; to the receiver, that he may sustain his account (if he can), by additional evidence, or make such explanation as the case may require. This rule, it is true, would not

[2] [The supreme court affirmed the decree of the circuit court on the merits in the case referred to.]

deter the court from directing an account to be reformed which contained manifest errors or plainly improper charges; but such errors or improper charges ought to be clearly shown to exist, and their character as such ought to be evinced by the proofs in the case or by their intrinsic nature. I am not satisfied that any of these exceptions are thus sustained; and therefore feel bound to overrule them.

2. The next exceptions presented are to the report of Master Waul, made upon the accounts of Tipton Walker, receiver, for the consecutive months commencing with May, 1867, and ending with November, 1868. These exceptions are founded upon objections made before the master, and are, therefore, properly taken here—so far as exceptions (properly so called) can be taken to the report of a master on a receiver's accounts. For the books make a distinction between a master's report on a receiver's account and a master's report containing an account taken and stated by himself, or a report upon a matter referred to him for his own investigation and ascertainment. A receiver is an officer of the court as well as a master, and states his own accounts and submits them to a master for inspection under the order of the court; the master acting in place of the court, in a judicial, rather than a ministerial capacity. Strictly speaking, exceptions to his report in such cases do not properly lie, as they do to an account stated by himself, as in the case of executors, administrators, trustees or partners, who are ordered to account before him. Nevertheless, if the master adopt any erroneous principle in allowing a receiver's account, the court, on petition of the proper parties, will refer the matter back to him for correction. The exceptions now presented, if we disregard the form, may be viewed substantially in the light of such a petition. But the distinction should be kept in view. For upon this distinction depends, in considerable degree, the nature of the duty now devolved upon the court. That duty consists in reviewing the principles and rules adopted and followed by the master in allowing the receiver's accounts, rather than in examining the items of the account in detail, or the evidence on which those items are severally founded; the latter duty belonging, more especially, to the province of the master acting in his judicial capacity; analogous to the province and duty of a jury on questions of fact. In this case there are several classes of charges for disbursements made by the receiver, which can be considered in groups, and with reference to which the principles by which the master was guided in allowing the account can be reviewed. The first class which I shall consider embraces the charges for rebatement of freight, being an allowance returned to shippers of cotton, in consideration of securing their business and good will on the road. It is in proof, that this is equiva-

lent to the allowance of drawbacks made by many transportation lines in the country; that it is a customary, or at least quite a usual thing; that it was necessary in this case in order to secure business on the railroad, as it had been previously adopted by a competing line; that it actually had the effect of bringing a large amount of business upon the road; and that, without it, the road would not have paid expenses. Whatever objection to these rebatements might be made by the state, or by planters and others who did not obtain like favorable terms, it does not lie in the mouths of stockholders or creditors who reap positive benefits from the arrangement to complain of it. Their doing so is calculated to raise a suspicion that they are solicitous about other interests than those which they have in the prosperity of this road. The court concurs with the master in opinion, that the receiver was justified in adopting the arrangement; and that the exceptions to that class of charges should be disallowed.

The next class of charges relates to the purchase of a truck wagon and a pair of horses and harness, for the delivery of freight in the city of Houston, and the expenses of taking care of and keeping the same. It is in proof that this was also a necessary and profitable outlay for enabling the railroad, by furnishing additional accommodations to customers, to compete with an opposition line. The court concurs with the master in allowing these charges, and disallowing the exceptions thereto. The outlay was fairly within the discretionary powers of the receiver in managing and carrying on the railroad with prudence and economy. The same may be said with regard to drayage and wharfage; and the exceptions in reference thereto will be disallowed. And it may be laid down as a general proposition that all outlays made by the receiver in good faith, in the ordinary course, with a view to advance and promote the business of the road, and to render it profitable and successful are fairly within the line of discretion which is necessarily allowed to a receiver entrusted with the management and operation of a railroad in his hands. His duties, and the discretion with which he is invested are very different from those of a passive receiver, appointed merely to collect and hold moneys due on prior transactions, or rents accruing from houses and lands. And to such outlays in ordinary course, may properly be referred, not only the keeping of the road, buildings and rolling stock, in repair, but also the providing of such additional accommodations, stock and instrumentalities as the necessities of the business may require, always referring to the court, or to the master appointed in that behalf, for advice and authority in any matter of importance, which may involve a considerable outlay of money in lump. And except in extraordinary cases, the submission by the receiver of his accounts to the master at frequent intervals, whereby the latter may ascertain from time to time the character of the expenditures made, and disallow whatever may not meet his approval, will be regarded as a sufficient reference to the court for its ratification of the receiver's proceedings. In extraordinary cases, involving a large outlay of money, the receiver should always apply to the court in advance, and obtain its authority for the purchase or improvement proposed.

With these principles in view, the court has carefully examined the master's report, and the reasons given by him for disallowing the exceptions taken to the receiver's account, as well as the evidence taken in relation thereto, and sees no reason, in the main, to differ from him in the conclusions to which he has arrived. On the contrary, the court feels bound to express its approbation of the apparent carefulness and good judgment with which the master has performed his duty. The exceptions of the defendants to the master's report are, therefore, overruled.

The receiver, on his part, has filed exceptions to the report, because of the master's disallowance of certain charges in the account. The first of these relates to the purchase of a pair of new scales, or balances, for the sum of $463.55. The master disallows this item on the score of improvidence. As these scales were procured in good faith, and for no possible advantage to the receiver himself, and remain amongst the assets and property of the road, I think the charge should have been allowed. This exception to the report is therefore allowed.

The next exception of the receiver relates to the rent paid for offices. It is alleged that the receiver rented more office room than was necessary for his purposes, and the master has deducted two items of $125 each from the amount paid for that purpose. It seems to me, from the evidence of Mr. Hitchcock, and the receiver himself, that the latter was justified, under the circumstances, in the expenditure made by him on this account. This exception is therefore sustained.

The next exception of the receiver relates to the items of $260.05, and $260, for advertising the accommodations of the road in New Orleans. The advertisement contains a favorable reference to Walker, Kent & Co., as proper persons to facilitate the forwarding of freight. For the reasons stated by the master I am satisfied with his decision on these items, and disallow the exception. It is true that the receiver has shown that he was not interested in the firm of Walker, Kent & Co., but the use of his name in the firm, with his consent, made him liable for its obligations, and to that extent he was interested in its success; an advertisement therefore which had for its object, in whole or in part, the promotion of the interests of that firm should not be charged to the fund of which the receiver was a trustee.

The next exception of the receiver relates

to the master's disallowance of interest paid by him for money borrowed of the bank. The master disallowed this interest because, as the accounts appeared before him, the receiver had large balances of money on hand at the time when he made the loans on which the interest in question accrued. But it has since been shown (and I think satisfactorily), in corroboration of what the receiver himself alleged under oath, that these balances were fictitious; that large amounts had been paid out by the receiver for which he had not obtained the proper vouchers when the balances were made up; and that he was obliged to make the loans in question in order to carry on the operations of the road. I am, therefore, satisfied that the disbursements for interest were proper, and that the receiver's exception to the report in reference thereto should be allowed.

The final exception of the receiver relates to the disallowance of his salary. As this subject will be separately discussed I pass it for the present.

The next exceptions are to the report of Edward T. Austin, master, made upon the accounts of said receiver from December, 1868, to September, 1869, inclusive. These exceptions principally relate to charges for rebatement, wharfage and drayage, interest paid for money loaned, certain payments to Mr. Andrews for services rendered, certain incidental expenses relating to the receiver's accounts, and the allowance to be made to him for his services as receiver.

I have carefully examined these exceptions with the master's report and the evidence taken by him, and I concur generally in the results to which he has arrived. Upon the additional evidence taken before him he disallows the exceptions to the payment of interest for money loaned, and I concur in this result. Several accounts have been suspended by him for further direction from the court. These are: First. The charges for moneys paid by way of rebatement on freight. These charges will be allowed, for the reasons before stated. Second. The receiver's expenses, and counsel and witness fees for defending himself against the motion for his removal. These charges amount in the aggregate to $2,902.85. If the receiver gave no occasion for that motion, he was put to unnecessary expense and ought to be reimbursed, either out of the money in his hands or by the defendants who made the motion. The trust fund as well as the receiver, ought not to suffer for an unreasonable and causeless application on the part of the defendants. But was the application of that character? Had the defendants no ground whatever for making the motion they did? Without at this point deciding upon the receiver's faithfulness or unfaithfulness to his trust, it is evident from an inspection of the reports, both of Master Waul and Master Austin, that the accounts of the receiver were all along so complicated and unintelligible, that

no satisfactory conclusion could be formed therefrom as to the condition of the trust, or the relative state of the accounts as between the Galveston, Houston & Henderson Railroad Company, and the other parties in interest; of this want of certainty, this confusion of the various accounts, this vagueness as to the condition of the trust, the defendants constantly and repeatedly complained before the masters, until at last Master Austin refused to pass the receiver's accounts until they were rendered in a form calculated to give the information desired, as required by the original order. After this was done a much more satisfactory exhibit was presented. But this was after the application for removal had been made.

I cannot say that the demands of the defendants for a more specific statement of the accounts were unreasonable; nor that the difficulties which they experienced in getting at an explanation of the various items were not calculated, in connection with other things, to raise suspicion as to the faithful management of the receivership. I think that these circumstances are sufficient to exonerate the defendants from the burden of paying the costs and expenses incurred by the receiver. Are they sufficient to cast the burden on the receiver himself? If the receiver acted in good faith, and was ever ready as far as he was able, to make any explanations that were personally required, but was unskillful in the manner of keeping his accounts, he ought not for that cause to be visited with a penalty. It is not every good business man, or engineer, or superintendent, that understands bookkeeping. It requires a peculiar aptitude to state and keep accounts with clearness and accuracy, especially where the transactions are varied, extensive and complicated. I should not feel disposed, therefore, to cast the burden of the expenses referred to on the receiver, personally, unless satisfied that his method of keeping his accounts was adopted for the purpose of producing confusion and covering up the nature of his transactions. I do not see any sufficient evidence that this was the case. On the contrary it seems to have been the endeavor of the receiver to keep regular books and a constant record of his transactions; and for this purpose he has employed competent clerical assistance. But the intrinsic difficulties of the case may well afford some excuse for a defective exhibition of all the aspects of the various receipts and expenditures. If I were satisfied that the receiver was unfaithful to his trust, and did not, according to the best of his ability and understanding, perform the duties thereof, I should feel that I ought to cast the burden of these expenses on him. For that would have furnished good ground for his removal. But I cannot say, from anything which has been developed in the case, that he has not acted with entire integrity of purpose. Some things are undoubtedly susceptible of just

criticism. I refer particularly to his acquiescence in paying out of his own anticipated allowance a stipulated sum to the counsel of the complainants. But it must be remembered that he was in the habit of frequently consulting that counsel and taking his advice and direction. He had a perfect right to do this, although it would have given less cause of dissatisfaction to the defendants had he invariably sought the advice of some attorney entirely disconnected with any of the parties to the suit. On the whole I do not consider the circumstances of these payments to counsel injudicious, as it may have been for the receiver to have thus exposed himself to unfavorable criticism, as indicative in him of any want of fidelity to his trust, or of integrity of purpose. It was undoubtedly a mistake so far as it regarded his relative position towards the different parties in the cause; and was calculated to awaken suspicions, and to destroy confidence in his administration. But being done on his own responsibility, and not charged to the trust, it was not necessarily inconsistent with entire rectitude of intention, as it regards the administration of the trust fund. Besides, this was not one of the grounds on which it was sought to remove the receiver, not having been known to the defendants at the time, and did not therefore enter into the considerations upon which any of the parties were then governed, and the receiver had certainly acted on the supposition that his allowance for services would be more than sufficient to cover any advances thus made by him.

I am disposed, therefore, on the whole, to allow the receiver's expenses in this behalf; and more especially in view of the fact that the charges against him were, by an amicable arrangement, withdrawn, and he thereupon voluntarily surrendered his charge to the court, rather than continue therein to the evident dissatisfaction of one class of the parties interested. This claim will, therefore, be allowed The only other matter suspended by the master was the question of compensation for the receiver's services. This will be the next in order for consideration.

In the matter of compensation to be allowed the receiver.—The question of allowance to the receiver for his services is one that properly belongs to the master's office, and not to the court. In this case especially, the local knowledge possessed by the master with regard to the business habits and compensation for business and professional services in this community would have rendered a decision by him peculiarly valuable. But as it seems to be the desire of the parties that this matter should be decided by the court, and as the order made by Justice Swayne seems to contemplate such a course, the court will endeavor to discharge the duty as well as the means it has before it for arriving at a proper conclusión will admit.

In the first place it is claimed on the part of the receiver that this question is concluded by the report of the first master, Hughes, and the acquiescence of the defendants. I do not so regard it. It is sufficient to say that, by the subsequent decision of the court, reserving the further consideration of the subject, and requiring evidence to be taken upon it, the question is now open, if it was ever regarded as settled. But the evidence does not satisfy me that the defendants did ever acquiesce in the allowance of $15,000 a year. The receiver probably supposed they did, or at least supposed that the decision of Master Hughes was definitive, not being objected to by the defendants until so late as the 24th of March, 1868. He undoubtedly for a long time acted under that impression, and this is one reason why his payments to Mr. Hale are to be regarded as a personal matter of his own, not intended to affect the trust fund for which he was accountable. But whatever his impression may have been, neither the parties nor the court were committed to any specific allowance. For the receiver, it is insisted that the court confirmed Master Hughes' report, and that this confirmation was for a long period undisturbed, so that the receiver was misled. Besides, the fact that the confirmation of a master's report on receiver's accounts is not required, and therefore has no judicial effect, it is obvious to remark that all this was for the consideration of the court upon the hearing of the exceptions to Master Hughes' supplemental report relating to the receiver's compensation, and cannot have any influence upon the question as it now stands.

By the order of Justice Swayne, it is made an open question, and must be decided on its merits alone. The defendants, on their part, contend that the receiver has forfeited his title to all compensation, or, at least, to full compensation, in consequence of unfaithfulness to his trust, and complicity in alleged dishonest schemes entertained and attempted by the complainants.

Two matters have been specially referred to in support of this position. The first is, the before mentioned agreement to pay to the counsel of the complainant $5,000 a year out of the receiver's allowance, provided the latter should not be less than $15,000 a year. This point has already been considered, and my views upon it fully expressed. I do not regard it as furnishing cause for refusing to the receiver the proper compensation for his services. The other matter is the agreement entered into by the receiver with N. A. Cowdrey and others to give them twenty-five per cent. of the gross earnings of the railroad for the use of the Galveston bridge proposed to be built by them after the destruction of the former bridge. It is unnecessary to go into detail for the purpose of reviewing the history of that transaction. Suffice it to say, that I have failed to discover, in the proofs, evidence to convince me that the receiver acted corruptly or in bad faith. The proposition was properly referred to the court and

notice thereof given to the parties interested. A better bargain for the railroad company was effected, viz., a rent of ten per cent. of the gross earnings of the road for the use of the bridge; and there is no evidence to show that the receiver was not entirely satisfied and pleased with the result. The problem is one that might easily have led the fairest minds to quite different results. With our present knowledge of the cost of the bridge, and the amount of business commanded by the road, it is plain to see that ten per cent. is ample compensation; but at that time matters wore a different aspect. The receiver was paying 33⅓ per cent. of the gross earnings of the railroad for transportation across the bay. The perils to which a bridge would be exposed had recently forced themselves strongly upon the public attention, and the earnings of the road at this time were averaging only about $160,000 a year. Supposing the receiver to have been anxious for its prosperity, it would be very natural for him to seize with avidity a proposition which would result in less expense than that involved in the arrangement then existing, and would relieve the freight of the road from the delay of a troublesome transhipment, and perhaps from other embarrassments arising from the conflict of adverse interests, which are indicated in the evidence.

Regarding the receiver's conduct, therefore, in a spirit of fairness and common charity, I cannot see anything in this transaction which convicts him of want of integrity or good faith. It is so easy and so natural for us all, after an event has happened, to be over-wise, and to be hypercritical upon the conduct of those who were actors in the antecedent chain of transactions which led to it, that we ought to be on our guard against imputing the worst motive of which an action is susceptible. We all know how fortunes have been within our reach in the past had we but purchased property in or near growing cities at a time when the prices were depressed, and land could have been bought for a trifle. After the local improvements have been made; after the city has sprung up around us; after prices have risen; standing on the vantage ground of developed events, and looking backward at the past, we wonder at our own stupidity in not having seen the chances that lay within reach, forgetting that the light of present circumstances did not shine upon us then as it does now; that the future is ever hid from our view. This after-wisdom—this hind-sight as it has been aptly called—leads us unjustly to condemn ourselves and unjustly to condemn others, for not foreseeing events which could not be foreseen. A fair calculation of the chances may be excited into activity by keen self-interest, or keener antagonisms and competitions, which by good fortune may result in fortunate speculations. But when the question before us is one of honesty and fairness of intention, and the acts adduced as evidence

to prove the opposite consist merely of estimates and conclusions with regard to the future developments of business, we ought to hesitate a long time before we adopt a harsh conclusion.

Mr. Walker is dead. His attainments as a man of science and an engineer were of no ordinary kind. Unless compelled by the interests of justice, we ought not to lend too willing an ear to suggestions affecting his character for integrity and honesty. The proof of his deficiency in these respects ought to be clear and unmistakable. His devotion to the interests of this road after his appointment as receiver was, I think, undoubted. He may have occasionally erred in judgment. He may have had too great deference for the views of the complainants, who represented the interests of the bondholders, probably under the not unnatural impression that, so far as the main line was concerned, theirs was the only substantial interest at stake, as the bonds, if valid, would be likely to absorb the entire property. But it must be acknowledged that under his administration, the road was brought up from an almost hopeless condition, after the epidemic and the destruction of the bridge, in 1867, to one in which the receipts considerably exceeded the ordinary expenses; and that a large amount of earnings, in addition to the moneys borrowed by him as receiver, were expended in the preservation and improvement of the property.

From the accounts presented to Master Austin, and from other evidences in the case, it appears that $30,310 in specie, and $91,655 in currency, were expended by him in permanent improvements and additions to the road and its equipment, besides what was disbursed for necessary expenses and repairs. This would be equivalent to $131,000 in currency, spent in improving the property. It is true that this was not all produced from the earnings. The receiver obtained $51,000 from the treasurer of the defendant's company, when he was appointed, and was indebted some $60,000 for money borrowed and other liabilities, when he surrendered his trust. But it is in proof that a sum at least equal to the $51,000 received from the treasurer was paid by the receiver on account of the debts of the Galveston, Houston and Henderson Railroad Company, successor. And at the time of the surrender, the road was doing a fine and increasing business.

Having come to the conclusion that the receiver was fairly entitled to compensation, the next question is, what ought that compensation to be? It would hardly be a proper rule for governing the case, to inquire what another even competent person would have been willing to do the work for. The receiver's office is not put up at auction. His compensation is not fixed on that principle at all.

The chancellor selects a person whom he

regards competent and trustworthy, and the amount of compensation is graduated somewhat by the duties, and somewhat by the responsibilities of the situation. In cases of moderate amount, five per cent. on the receipts and disbursements has been allowed, which in this case would have amounted to something like $25,000 or $30,000 a year. But where the amounts received and disbursed are large, it is not usual to allow a percentage, but to fix the compensation in some other manner. In one case, it is true, it was held that a receiver who discharges his duty is entitled to the usual commissions, although they appear to be more than a reasonable compensation for the services rendered; and that it was no ground for an exception to the general rules, that the business was conducted almost entirely by overseers and factors, inasmuch as the receiver had incurred the responsibility incident to these subagencies. See Price v. White, 1 Bailey, Eq. 240; note to 2 Daniell, Ch. Pr. 1435. The information elicited by Lord Langdale, in Dow v. Croft, 2 Beav. 488, quoted in Daniell's text, is useful on this head. "The masters," he says, "have each of them been good enough to furnish me with a certificate, and I find there is no general rule which universally prevails as to the allowance to a receiver, where the receipts consist of rents of freehold and leasehold estates, five per cent. upon the amount received is most frequently allowed. If there be any special difficulty in collecting the rents on account of the sums being extremely small, or of the payments being frequent, as weekly payments, then the allowance is increased; on the other hand, if there should be very great facility in receiving the rents, then less than five per cent. is allowed, etc. One master allowed four per cent. in one case; another allowed an amount equal to £300 a year at first, and afterwards £150 a year, and after that £50 a year for the same rents—the difficulty having been diminished by long leases." In conclusion, he says: "It appears, therefore, that the masters, as they ought, consider upon each occasion what is fit and proper to be allowed, having regard to the degree of difficulty or facility experienced by the receiver."

Where a receiver is a manager as well as a mere receiver, his duties and responsibilities are largely increased; and the management of a business like that of a railroad is one of the most difficult and responsible duties that a receiver is charged with. It requires a man of first rate qualities and attainments. Now, we have it in proof that the railroad presidents of the country receive various sums from $3,000 to $20,000, a year, many of $5,000, some of $10,000, a few above $10,000. Most of the defendants' witnesses think that $5,000 a year would be ample compensation to the receiver for his services, whilst most of the witnesses called for the receiver think that $15,000 coin is not any too much; that

he saved much more than that to the road, etc. The receiver's income before his appointment was, by the estimation of one witness, about $7,000 a year; said to be of a permanent character; all of which he was obliged to give up when he assumed the duties of the receivership; and he himself says, that he would not have consented to take the office for less than $15,000 a year. The previous salaries given by the defendant railroad company have been referred to as being only $5,000; and sometimes not so much as that. In view of all this evidence, of the assistance which the receiver had around him, and of the principles which the law lays down with regard to the compensation of receiver, I am inclined to think that $10,000 in coin per annum would be a fair rate of compensation in this case. It seems to me, that $15,000 is large, larger than what any (except two or three) of the presidents of our most important railroads in the country receive. It also seems to me that the peculiar duties, responsibilities and accountability of a receiver entitle him to a larger amount than would be demanded by the head officer of an ord'nary railroad of this size and business. An allowance of $10,000 coin per annum will, therefore, be made for the receiver Walker's compensation during the time he was such receiver. His accounts will be stated on that basis. If this allowance should bring the receiver in debt to the fund, I think the complainants in the cause should make good the deficiency to the extent of the moneys paid by the receiver to their counsel, as shown by the vouchers produced before me on this hearing, namely the payments made at the rate of $5,000 per annum. So far as the receiver chose to pay that money out of his own pocket, it was a matter for his own consideration; but so far as he paid it out of the funds in his hands, beyond the amount which is now allowed to him, it should be returned. Therefore, any deficiency or indebtedness due from him to the fund, which may appear in making up his accounts, not exceeding the sums so paid by him to counsel as aforesaid, will be charged to the account of the present receiver, as representing the complainants. I do not regard it necessary to make any other order in reference to those payments.

In the matter of motion to discharge N. A. Cowdrey, as receiver. The next question for consideration is that of the motion to discharge the present receiver. This motion is made upon several distinct grounds which are specified therein. These grounds all relate to his conduct since his appointment. The charges are, 1st. That he incited and joined in the effort to cause the abandonment and destruction of the line and track of the Galveston and Houston Junction Railway Company, thereby violating his duties as receiver. This is attempted to be proved, by showing that the receiver has privately incited the town council of Houston to pass an or-

dinance or ordinances for stopping the use of the Junction Railroad bridge at Houston, in which the defendants claim to be interested and for abating it as a nuisance, and to give a right of way for another route through the town; and by showing that he is engaged in furthering a new connection with the Houston and Texas Central Railroad through the town, in continuation of the old track of the Galveston, Houston and Henderson Railroad, and to the abandonment of the Junction Railroad; and that he has actually applied to the court for leave to procure such new connection; all this is complained of by the defendants as bad faith on the part of the receiver; as a breach of trust; as treachery towards the interests, which, by his appointment and by the terms of his bond, he was bound to protect. Now, in the first place, it is not proved to my satisfaction that the receiver did incite the town council to pass the hostile ordinances referred to; as to the part taken by him in the amended ordinance, by which the city gave the right of way to build a new road through the town, and in making application to the court on the subject of such connection, I see nothing that renders him obnoxious to the severe censures which the defendants have passed upon his conduct. He has not proposed to do anything definitive on the subject, without the leave and order of the court, to be made after due notice to the defendants. This is a sufficient answer to the whole charge. Should the court deem it for the interest of the trust to allow the receiver to send his trains through the town of Houston instead of over the Junction road, I know of no reason why the court should not make an order to that end. There seems to be no contract by which the Galveston, Houston and Henderson Railroad Company is bound to send its freight or passengers over the Junction Railroad at all events; and if the two interests should ultimately be adjudged distinct, as they have already been adjudged, it is hardly to be supposed that the parties owning the Galveston, Houston and Henderson Railroad will rest content to be dependent on the Junction road for a connection with the Central Railroad, if they can help it, without some favorable and permanent contract in reference to the terms of that connection.

Other reasons have been suggested by the receiver why a new outlet and connection would be desirable, such as the destruction of the bridge, etc., which it is unnecessary to refer to. In any view of the case I cannot see how it can constitute a crime on the part of the receiver, in view of the possibility of such a severance as I have adverted to, to lay before the court the facts of the case, and the terms on which a new connection can be had; especially so long as he submits himself to the orders and direction of the court. Nor can I regard the order by which the receiver was appointed as constituting or raising, by implication, any such agreement, to use the Junction road and nothing else, by way of connection with the Houston and Texas Central Railroad, as to make it a matter of dishonesty or bad faith to apply to the court for leave to provide an alternative connection by another route. If the defendants think that such leave would be injurious to them, and would not be a fair thing to do at this time, it is competent for them to appear before the court and say so; and it is to be presumed that the court will see that no injustice is done. And in judging of the receiver's conduct it must be remembered, as has been properly said, that he is a complainant as well as receiver, and has rights as a complainant which he is not bound to ignore and forget in any applications to the court which he chooses to make. And, in this connection, it is proper to remark that the whole transaction, which took place before Justice Swayne on the 19th of August, 1869, by which the defendants agreed that the complainants, on giving security to the amount of $350,000, should have the possession and management of the property and name the receiver, places the defendants in a somewhat different attitude towards that officer from what they would be in if he were appointed by the court in the ordinary way—it certainly does not lie with them now to object to the person of the receiver unless he commits some overt act of unfaithfulness to his trust, which can be specified and pointed out. On this account, as well as on others, it seemed to me incompetent for the defendants to go into previous transactions of the receiver, as complainant, in order to show that he had heretofore done acts which exposed him to personal animadversion. The other grounds stated in the motion are all of the same general character with that already mentioned. The defendants have entirely failed, it seems to me, in proving a single act of the receiver since his appointment, which shows a want of faithfulness in discharging the duties of his trust, and in view of the terms of the order under which he was appointed, I can see no reason or ground for his removal.

The motion is therefore denied.

In matter of motion for change of location of road. The next subject to which my attention has been directed is a motion on the part of the receiver for an order authorizing him to procure the construction of a new connecting road through the city of Houston, to connect with the Houston & Texas Central Railroad. This application was made in his report of November 19, 1869, in which he sets forth the inconveniences and dangers of the present connection, the anxiety of the city of Houston to have the present bridge removed, etc. This cause has been appealed to the supreme court of the United States, and it is expected that it will be reached for argument in January next. It is desirable that it should be disposed of at as early a day as possible, and no doubt the court will give

every facility for an early determination of the case, consistent with the practice of the court. The decision on that appeal will determine the rights of all the litigating parties, and will terminate many questions now undecided. In view of this expected early disposition of the main cause, it seems to me inexpedient to enter upon any new expenditures of much importance until that consummation can be reached. The desirableness of many contemplated changes and improvements will depend in great degree upon the final determination of the case. I do not feel disposed, therefore, to make any order authorizing the receiver to expend any of the trust funds for building a new road to connect with the Houston & Texas Central Railroad. Should any other parties build such a connection, so that the track belonging to the Galveston, Houston & Henderson Railroad in the streets of Houston can be utilized and used, and should it be shown that the interest of the entire fund would be subserved by running trains over the same instead of over the Junction Railroad, it will then be time enough to consider the question. The court cannot now make any order which should direct the receiver to use such new connection, or which should guaranty to the constructors of any new road the use thereof in preference to the Junction Railroad. My impression is, that in view of all the conflicting interests represented in the case, it will be better to continue the present connection at least, until the case shall be decided. Any saving made by the Galveston, Houston & Henderson Railroad by a new connection would be attended by a corresponding loss to the Junction Railroad Company, whose creditors and stockholders are looking to the court for protection, and as the rights of the parties are not yet finally determined, and it is uncertain how they will be determined, it seems to me best to keep the business in statu quo until the final decision shall be rendered. If it were certain that the roads would be severed by the final decree, I should deem it unjust to the bondholders to keep the Galveston, Houston & Henderson Railroad united to the Junction Railroad by force. But this is not certain, and therefore it is better for the court not to take any new and radical action in the matter.

My view is the same with regard to the purchase of the bridge across Galveston bay. I do not think it would be right for me, sitting merely to superintend the receiver's administration of the property, to authorize any such radical change as the purchase of the Galveston bridge, when the whole cause will be decided and the property will be in private hands so soon, who can then do with the property as they see fit. I therefore decline to make any order on either of these applications.

As to the application for the purchase of new rolling stock, I will make an order that the receiver be authorized to purchase such new rolling stock, iron rails, machinery, etc., as in his judgment may be required for the proper transaction of the business, beyond the rolling stock, rails and machinery now in his possession and control under his appointment as receiver, and as the funds in his hands will reasonably justify. Every dollar fairly expended on the road and rolling stock will be more than reimbursed by the increased value it will give to the whole property when sold.