CENTRAL TRUST CO. OF NEW YORK and others *v.* WABASH, ST. L. & P. RY. Co. and others.  (Nos. 2,357 and 2,464.  Consolidated Cause.)

*(Circuit Court, E. D. Missouri, E. D.*  September, 19, 1887 )

RECEIVERS—INSOLVENT RAILROAD—COMPENSATION.
> Tutt and Humphreys, receivers of the Wabash, St. Louis & Pacific Railway Company, allowed $70,000 each for their services to date.

In Equity.

*Martin, Laughlin & Kern* and *Phillips & Stewart*, for the purchasing committee.

*H. S. Priest* and *Hough, Overall & Judson*, for the receivers.

BREWER, J.  The question now presented for determination is the compensation to be allowed to the receivers.  The master, upon consideration of the testimony, allowed each $112,500.  Exceptions were taken by the purchasing committee, and these exceptions bring the matter before us for consideration.  Heretofore all the principal allowances in this case have been settled by the agreement of the parties, and after such agreement all the court's action has been a *pro forma* approval.  But this allowance is contested, and a large volume of testimony taken.

As preliminary I remark that there has been no little implied criticism in the language of appellate courts of the magnitude of the allowances made in foreclosure cases to counsel, receivers, and others.  We are admonished by utterances of the supreme court to be cautious in this respect.  In the case of *Hinckley* v. *Railroad Co.*, 100 U. S. 153, the amount allowed to the receiver was $10,000, for nearly two years' services.  He claimed $1,000 per month.  Upon this the supreme court, through Mr. Justice MILLER, made this observation:

"The principal witnesses of appellant to sustain this exception are two gentlemen who were themselves receivers of other roads, and thought they rightfully received $900 in one case, and $1,000 in the other, per month.  Perhaps they were the best judges of the value of their own services; but such is not always the case, and as there is conflicting testimony, and as this is the first time we have been called on to review the allowance made to railroad receivers by the circuit courts, we do not see that the economical administration of insolvent companies will be promoted, or that justice requires a higher standard of compensation than these courts generally give, to whose discretion the subject must be largely remitted."

In the case of *Trustees* v. *Greenough*, 105 U. S. 527, certain allowances were set aside by the supreme court, and in respect to this matter of allowances generally this language is to be found:

"In the vast amount of litigation which has arisen in this country upon railroad mortgages, where various parties have intervened for the protection of their rights, and the fund has been subjected to the control of the court, and placed in the hands of receivers or trustees, it has been the common practice, as well in the courts of the United States as in those of the states, to make fair and just allowances for expenses and counsel fees to the trustees, or other

parties, promoting the litigation, and securing the due application of the property to the trusts and charges to which it was subject. Sometimes, no doubt, these allowances have been excessive, and perhaps illegal; and we would be very far from expressing our approval of such large allowances to trustees, receivers, and counsel as have sometimes been made, and which have justly excited severe criticism. Still, a just respect for the eminent judges under whose direction many of these cases have been administered, would lead to the conclusion that allowances of this kind, if made with moderation and a jealous regard to the rights of those who are interested in the fund, are not only admissible, but agreeable to the principles of equity and justice."

This court has, in the progress of this very case, as well as at other times, expressed its intention to proceed cautiously, and, while giving adequate compensation, to not overstep the bounds of such compensation. I remark again that the question of allowances is a judicial one, and while, as it is said, the matter is left to the discretion of the court, it is discretionary only in the sense that there are no fixed rules to determine the proper allowance, and is not discretionary in the sense that the courts are at liberty to give anything more than a fair and reasonable compensation. We desire to see the officers and agents of the court well paid, in order that men of character and ability may be willing to accept the burdens and responsibilities of these trusts; but at the same time we may not forget that the property to be charged with these allowances is not ours, that there are many thousands scattered all over the land who are the owners, whose property by the strong hand of the law has been taken out of their custody, and who look to us to see that no unjust or excessive burden is cast upon them. We may not exercise the generosity of owners, but are closely limited to the justice of judges. Our duties are as sacred, our responsibilities more solemn than those of any other parties connected with this foreclosure, for our action is almost certainly final.

With these preliminary observations I pass to a consideration of the facts. We have already allowed these receivers $50,000 each, and the purchasing committee, representing the present owners of the property, insist that this is full compensation. The master, estimating the duration of the trust at three and one-half years, has allowed, as I have stated, $112,-500 to each. It is well said by Mr. Justice Bradley, in the case of *Cowdrey* v. *Railroad Co.*, 1 Woods, 331:

"It would hardly be a proper rule for governing this case to inquire what another even competent person would have been willing to do the work for. The receiver's office is not put up at auction. His compensation is not fixed on that principle at all. The chancellor selects a person whom he regards competent and trustworthy, and the amount of compensation is graduated somewhat by the duties, and somewhat by the responsibilities, of the situation. It seems to me that the peculiar duties, responsibilities, and accountability of a receiver entitle him to a larger amount than would be demanded by the head officer of an ordinary railroad of this size."

The administration of this Wabash property has been under my supervision. It is true that my then associate, Judge Treat, was more familiar with all the details, and therefore exercised a more immediate and constant supervision, and was doubtless more familiar with all the

varied steps taken in it, and we lose the benefit of his knowledge in coming to our conclusions; but I am familiar enough with its administration to appreciate its magnitude, and the labor and responsibility of the receivers; and beyond the testimony which was given before us of the general outlines of the administration, I rest upon my own recollection and knowledge of what took place.    In determining the amount of compensation, we are to regard the magnitude of the trust, the care and responsibility springing therefrom, the time occupied in performing its duties, the skill and ability displayed, and the success which has attended its administration.    Messrs. Tutt and Humphreys were appointed receivers in the latter part of May, 1884.    The last of the property was surrendered to the purchasing committee on the first of April, 1887. During the trust they have received and paid out about $60,000,000. The mileage at the time of their appointment was about 3,600 miles. The property did not consist of a single line covered by a single mortgage, but was a system made up of the consolidating and leasing of some 30 or 40 different roads, upon each of which was one or more mortgages.    About $4,000,000 of floating and pressing debts were resting upon the company; its credit was gone; it was a wreck.    The property itself in many parts of the system was in very poor condition.    Within a short time after their appointment the disintegration of the property commenced.    Line after line was surrendered to trustees, mortgagees, and lessors, so that by the first of January, 1887, they had less than 1,000 miles under their control.    Of course, to take charge of a system so complicated, with so many varied and conflicting interests, so many underlying mortgages and separate branches, in such poor physical condition, with such a load of pressing debts, and with such a complete loss of credit, cast an immense burden of care and responsibility on these gentlemen, and required on their part the exercise of the highest skill and ability. It has been often said, and I think with truth, that no vaster and more complicated trust has, within the history of railroad enterprises in this country, been committed to any one.    To say that full and complete success attended their labors, under such adverse circumstances, is in itself the highest encomium that can be placed.    I had occasion to say, nearly a year ago, in respect to their action : "Their administration has been so successful that during the length of two years and a half, in which it has been carried on, not only has there been no challenge in the court of primary administration of the propriety of their appointment, but there has not been even a suspicion suggested here of any impropriety of conduct on their part, or any lack of fitness for the duties intrusted to them."    And I can at this day repeat that language and say that there has been no complaint in this court of a dollar improperly withheld by these gentlemen, and that the only charge made against them, a charge which upon examination was proved to be without foundation, was that they had in the payment of interest preferred the bonds of one division to those of another.    Another matter to be considered is this:    At the inception of their administration they found many labor claims pressing, and laborers threatening to quit for lack of payment.

On their personal guaranty they obtained money to satisfy the most pressing of these claims, and from time to time, as emergencies arose, they continued in like manner to obtain whatever was necessary to satisfy present and pressing needs. The aggregate of the sums thus advanced on their personal guaranty during the years of this administration is about $22,000,000. The value of this action on the part of these receivers (action which has secured the continuous and smooth working of the system) can hardly be overestimated.

On the other hand, it must be noticed that neither one of these gentlemen devoted his entire time to the business of the receivership. Mr. Tutt was prior to his appointment the president of the Third National Bank of St. Louis, and continued to discharge its duties in connection with those of the receivership. Mr. Humphreys, who had been a member of the firm of E. D. Morgan & Co., and at the time of his appointment engaged in winding up its affairs, continued to devote part of his time to the same duties. It is also true that, early in this administration, authority was given by this court to the receivers to issue $2,000,-000 of receivers' certificates, to meet the urgency of these floating debts, and that the daily receipts from the system were large, so that these gentlemen had something to fall back upon and protect them against loss in their personal guaranties. It is also true that they had a most accomplished general manager, Mr. Talmage, who had the personal charge of the operation of the road, and who was assisted by very competent and able gentlemen in the various departments under him. It would be a waste of time, I think, to go more into details of this administration; the main features are detailed in the testimony before us, as well as familiar to myself, at least, from personal observation. Beyond these facts we have the testimony of several gentlemen as to the value of the services. The receivers themselves, with the dignity which has characterized their conduct throughout this entire administration, have placed no estimate upon the value of their services; they have briefly and modestly told the story of their labor and cares.

The gentlemen who have given us the benefit of their opinions are these: Gerard B. Allen, one who for many years was one of St. Louis' best citizens, a merchant and manufacturer here, and who had no little experience in the administration of trusts, thought that $100,000 to each receiver was a fair compensation. S. W. Fordyce, the president of the St. Louis, Texas & Arkansas Railroad, at one time receiver of that road, placed his figures at $125,000. Robert E. Carr, at one time president of the Kansas Pacific Railroad, and a gentleman of considerable experience in railroad matters, named $100,000. S. M. Breckenridge, a lawyer of distinction in this city, and of experience in railroad foreclosures, thought the sum fixed by the master, $112,500, was reasonable. William Taussig, general manager of the St. Louis Bridge & Tunnel Company, said $30,000 per annum. On the other hand, George H. Nettleton, general manager of the Kansas City, Ft. Scott & Gulf road, and the Kansas City, Springfield & Memphis road, with its extensions, and a railroad man of large experience, having served as a receiver, thought

$15,000 a year fair compensation. Henry Morrill, general manager of the St. Louis & San Francisco, said from $10,000 to $12,000. G. W. Parker general manager of the Cairo Short Line, said from $6,000 to $12,000. H. C. Moore, at one time superintendent of the Missouri Pacific, fixed it at from $8,000 to $10,000. Charles Hamilton, superintendent of the Mobile & Ohio, thought $10,000 to $12,000. F. C. Wyatt, at one time superintendent of the Humeston & Shenandoah, named $15,000; and John O'Day, the first vice-president of the St. Louis & San Francisco, fixed it at from $10,000 to $15,000.

Obviously, there is a vast difference between the figures of these various gentlemen. They are all witnesses whose opinions are entitled to the highest respect on account of their characters, their abilities, and their experience; and yet the very differences that exist between them show that there is no fixed standard or rule to guide us, and that we must fall back at last upon our own judgment of what under the circumstances would be fair and reasonable compensation for the services. Beyond the opinions of these witnesses, we have been furnished with evidence of the salaries and compensations paid to railroad officials and receivers in other places; some of them quite high, some of them very low. These furnish but little assistance, because we are not advised of the circumstances under which they were fixed; each case must stand by itself. Bearing in mind the successful administration and felicitious outcome of this trust, and also bearing in mind the admonition of the supreme court on the subject in controversy, and remembering that we can only allow "fair and just" compensation for services actually rendered, and not that which the generosity of an absolute owner might prompt, we have fixed upon a rate of compensation intermediate between the high and low estimates above mentioned. The property was in the custody of these gentlemen less than three years, but, of course, subsequent to the surrender of the property they have been and are still engaged in closing up the trust. There are contingencies which may expose them in the future to tedious and painful litigation. We cannot as yet say definitely to what annoyance they may be exposed, or what labor may yet be cast upon them. Therefore we shall not fix the amount, as did the master, to cover all the services of this trust, but simply make an allowance to cover everything to date. The fact that there were two receivers, doubtless enabled each to devote some time to his other business; and so, if we allow $140,000, or $70,000 each, for services to date, we think the owners of the property will have paid no more than they ought to have paid for the services of these gentlemen; and the receivers, if disappointed in not receiving what from the action of the master they may have expected, will remember that we are trying to be as careful with this property as they were during their administration; and that a sense of duty to the owners prevents us from sustaining in full the allowances made by the master.

The exceptions of the purchasing committee will be sustained, and the allowance to each of the receivers for services to date will be fixed at $70,000.